**Donaldson & Chilliest**
**1825 Park Avenue, Suite 1102**
**New York, NY 10035**
**212-722-4900**
xdonaldson@aol.com

February 5, 2021

**BY ECF and Email**
The Honorable Richard J. Sullivan
United States Court of Appeals
Second Circuit
40 Foley Square
New York, NY 10007

  Re: *United States v. Cleon Clarke*,
     16 Cr 781 (RJS)

Dear Judge Sullivan:

  As the Court is aware, this Court allowed me to file a Supplemental or Reply motion on behalf of Mr. Clarke related to his submitted Motion for Compassionate Release. As such, we are requesting that the Court consider the below information related to the pending motion for Compassionate Release.

**Mr. Clarke Has Significant Medical Issues**

  The Government concedes that Mr. Clarke carries the sickle cell trait and has been diagnosed with high blood pressure. *Government Response,* p. 4. The government asserts, however, that Mr. Clarke's medical conditions do constitute "extraordinary and compelling" reasons that warrant immediate release or a minimum a reduction in his sentence. We disagree.

Sickle Cell Trait

  "Sickle Cell disease, causes COVID like symptoms—clotting, strokes, and severe oxygen deprivation…" *See,* https://www.statnews.com/2020/09/03/millions-carry-sickle-cell-trait-could-they-be-at-risk-for-severe-covid19/ and according to the CDC places people in an increased risk of severe illness from the virus that causes COVID. *See,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.   Sickle Cell disease occurs when a person has red blood cell disorders that cause the red blood cells to become hard and sticky and form a C shaped "sickle" looking cell that die early and also cause serious blood clogging. *See,* https://www.cdc.gov/ncbddd/sicklecell/facts.html. This clogging causes infection, chest syndrome and often times massive strokes. *Id*. Sickle Cell Trait is where a person carries

only one copy of the Sickle Cell mutation (two copies are required to have the disease). https://www.statnews.com/2020/09/03/millions-carry-sickle-cell-trait-could-they-be-at-risk-for-severe-covid19/.

While it is true that sickle cell anemia is significantly worse than sickle cell trait, having sickle cell trait could potentially worsen the lung and kidney disease associated with COVID because those with Sickle Cell Trait are already at increased risk for those lung and kidney disease.[1] *See,* https://www.statnews.com/2020/09/03/millions-carry-sickle-cell-trait-could-they-be-at-risk-for-severe-covid19/. Some "doctors believe people with the trait who catch COVID-19 could get the worst of the symptoms and are more likely to die from the virus." *See,* https://abc13.com/health/sickle-cell-could-cause-covid-19-vulnerability-research-shows/6425398/.

Indeed "a person with the sickle cell trait may experience serious complications if diagnosed with COVID-19." *See, United States v. Thompson*, 2020 WL 3470301, at *3 (C.D. Ill. June 25, 2020) (citing Sickle Cell Trait, CDC, https://www.cdc.gov/ncbddd/sicklecell/traits.html); *United States v. Lewis*, 2020 WL 5095471, at *5 (W.D. Wash. Aug. 28, 2020). *See also, United States v. Tazewell, supra, page 4-5.*

Dr. Modupe Idowu of UT Physicians Comprehensive Sickle Cell Center when relating the Sickle Cell Trait to COVID states that the trait was "once considered very mild…is not what we thought. *Id*. Indeed, Dr. Henry Taylor, a cardiologist, who directs the Cardiovascular Research Institute at Morehouse stated that "sickle cell trait, in the absence of extreme conditions or major health problems has negligible consequences for most people…COVID could change that dynamic---turning a silent condition into a deadly risk…". Dr. E. Leila Jerome Clay, a pediatrician who directs the sickle cell program at Johns Hopkins University All Children's Hospital in St. Petersburg, Fla. said "anyone that has the trait, or suspects they may have it…should take extra precautions to prevent exposing themselves to the virus." https://www.statnews.com/2020/09/03/millions-carry-sickle-cell-trait-could-they-be-at-risk-for-severe-covid19/. Unfortunately, it is simply impossible for Mr. Clarke to avoid exposing himself to COVID while incarcerated. As Judge Engelmayer noted, "the crowded nature of federal prisons in particular presents an outsized risk that the COVID-19 contagion, once it gains entry, will spread. In that respect, COVID-19 poses a heightened health risk to all inmates." *See, United States v. Ciprian*, 11 Cr 1032 (PAE), Dkt. 2581, p. 3-4.[2] This is corroborated by

---

[1] https://www.statnews.com/2020/09/03/millions-carry-sickle-cell-trait-could-they-be-at-risk-for-severe-covid19/

[2] "In this first association test between SCT and COVID-19 from a population-based cohort, we find Blacks had significantly higher rates than Whites for COVID-19 infections. The age at COVID-19 infection and death in Blacks were also significantly younger than Whites. Among Blacks, SCT carriers had similar COVID-19 infection rates but a trend of higher, albeit not statistically significant, death rate than non-SCT carriers. Independent larger/more diverse datasets are required to confirm these findings and to expand our knowledge of the association between SCT carriers with COVID-19 susceptibility and severity."
https://www.medrxiv.org/content/10.1101/2020.07.02.20145359v1.full-text

Government's Exhibit B (medical records) where there was an administrative note stating that "Inmate Clark is a close contact of a positive COVID-19 positive Inmate…". p. 12 or 139. Clearly, Danbury, aware that Mr. Clarke has high blood pressure and Sickle Cell Trait did not make sure Mr. Clarke was not in close proximity to COVID inmates which will absolutely jeopardized Mr. Clarke's health.

High Blood Pressure

On 11/29/20, Mr. Clarke had a blood pressure reading of 151/95. *See, page 19 of 139; Medical Records*. The American College of Cardiology and the American Heart Association define high hypertension as a blood pressure at or above 130/80 mm Hg and stage 2 hypertension as a blood pressure at or above 140/90 mm Hg. See Facts About Hypertension, https://www.cdc.gov/bloodpressure/facts.htm. That means Mr. Clarke had very high "high blood pressure." Notably, on August 1, 2019, Mr. Clarke had a blood pressure reading of 138/72. As such, his blood pressure appears to be worsening while he is being incarcerated. Moreover, throughout the medical records, Mr. Clarke appears to have complained about headaches, dizziness and blurry vision. Essentially, Mr. Clarke is not being properly cared for and/or his high blood pressure is not being properly controlled.

According to the CDC, persons with high blood pressure might be at an increased risk of severe illness should they contract COVID 19. *See*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions. Because Mr. Clarke has high blood pressure, he is twice as likely to die from COVID-19 as those without the condition, and those with uncontrolled hypertension such as Mr. Clark are at even greater risk. See European Society of Cardiology, High blood pressure linked to increased risk of dying from COVID-19, June 4, 2020, available at https://www.eurekalert.org/pub_releases/2020-06/esochbp060320.php; Darlene Dobkowski, Studies find hypertension most prevalent comorbidity in patients hospitalized for COVID-19, Cardiology Today, Sept. 10, 2020, available at https://www.healio.com/news/cardiology/20200910/hypertension-may-affect-outcomes-incovid19; William F. Marshall, COVID-19 and high blood pressure: Am I at risk?, Mayo Clinic, June 30, 2020, available at https://www.mayoclinic.org/diseases-conditions/coronavirus/expertanswers/coronavirus-high-blood-pressure/faq-20487663. Clinic, June 30, 2020, available at https://www.mayoclinic.org/diseases-conditions/coronavirus/expertanswers/coronavirus-high-blood-pressure/faq-20487663. *See also, United States v. Gotti*, 2020 WL 7706828, at *3 (S.D.N.Y. Dec. 29, 2020). "People with hypertension face at least a two-fold risk of death from COVID-19 compared to non-hypertensive individuals." *also quoted by United States v. Tazewell, supra, page 4-5.*

Not only do each of Mr. Clarke's medical conditions increase his risk of becoming seriously ill or possibly dying from COVID-19, but together they put him at a dramatic increased risk. See Ex. E, CDC Guidance ("The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19.") As the chart from the CDC illustrates, hypertension (high blood pressure) increases one's risk for hospitalization threefold. Together, with the Sickle Cell Trait, they increase one's risk for hospitalization even more, even though

Sickle Cell is not precisely quantified in this chart.[3] Additionally, Mr. Clarke is an African American man and the chart contained in note 4 indicates that minorities with hypertension (high blood pressure) are at an even higher risk of severe COVID illness. [4]

Further, patients who do not die from serious cases of COVID-19 often face prolonged recovery periods, including extensive rehabilitation from heart and neurologic damage and loss of respiratory capacity. See Jennifer Couzin-Frankel, Science, From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists, July 31, 2020, https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingeringproblems-alarm-scientists. Thus, even if Mr. Clarke were to survive COVID-19, his health could be severely impacted in long-term ways.

**Danbury cannot contain the Spread of COVID**

Mr. Clarke sleeps in a dormitory style room comprised of bunk beds separated by about 3 to 4 feet. Thus, men must sleep well within six (6) feet of each other. The dorms contain two (2) telephones that are approximately eight inches a part and the men usually wait within a foot of each other to use the phones because of the limited time provided to make calls. The computers are not properly separated and definitely are not adequately cleaned after each use. The bathrooms are very small with one urinal, five stalls and about 6 sinks. The sinks are within 2 feet of each other and again are not properly cleaned. In short, Mr. Clarke has no way to socially distance, practice proper hygiene, or protect himself from the virus in this environment. If Mr. Clark remains at Danbury, he is in great danger of contracting COVID-19 and suffering the potentially catastrophic complications that would follow.

**Applicable Law**

A court may reduce a defendant's term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) after finding that "extraordinary and compelling reasons warrant such a reduction." Under that provision, the Court may reduce Defendant's sentence if it finds that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). A district court's discretion in considering such a motion is broad: "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020); *see also, United States v. Tazewell*, 07 Cr 1035 (RMB), Doc. 86, p. 3.[5]  Here, extraordinary and compelling reasons warrant a reduction in Mr. Clarke's sentence, including: his serious risk of life-threatening complications if he contracts

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-underlying-medical-conditions.pdf
[4] Significantly, Mr. Clarke has the sickle cell trait and studies have shown that Sickle Cell is much more prominent in African American men than any other race.
[5] We note in *Tazewell*, the Court granted a compassionate release motion to a defendant recognizing that hypertension and sickle cell trait are serious enough pre-existing conditions to qualify as "extraordinary and compelling reason" during the COVID pandemic.

COVID-19 at Danbury; his lack of a serious disciplinary record while incarcerated, the extreme nature of his incarceration and his release plan.

As indicated above, Mr. Clarke has significant pre-existing medical conditions.[6] His blood pressure is categorized as level 2 and because he is an African American male he is in a higher percentage of getting seriously ill from COVID or actually dying. To make matters worse, he has the Sickle Cell Trait which again, because he is an African American male increases his likelihood of having the Sickle Cell but he becomes ill related to COVID, he will assuredly get extremely ill or die. Moreover, having both the Sickle Cell trait and very high blood pressure and being an African American male appears to triple or quadruple his chances of severe illness if he contracts COVID. Finally, the Government acknowledges that Mr. Clarke visited the medical unit on three (3) separate occasions complaining of, *inter alia*, dizziness, blurred vision, headaches, shortness of breath, and chest pains. Ironically, these complaints are symptoms of high blood pressure and issues related to his sickle cell trait. Clearly, he is not receiving proper medical treatment and based upon his aforementioned medical records, he is knowingly housed near COVID positive inmates.

Additionally, the Government concedes that Mr. Clarke's disciplinary record "includes one minor offense in 2018 and is therefore a positive sign for his future…" *Government response*. p. 5. This is absolutely true. Rehabilitation begins at the time of the first day of incarceration. In this case, Mr. Clarke voluntarily surrendered to law enforcement and since that initial day of incarceration, he has done his best to follow all rules and regulations.

Furthermore, during the last 12 months, Mr. Clarke has experienced the absolute worst prison conditions this country has seen in decades. When this Court sentenced Mr. Clarke, the Court could not have considered that this Country would experience the worst pandemic in over 100 years. As Judge Engelmayer stated in *Cipriani*, *supra*, "a day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing." Mr. Clarke has spent several months of his sentence enduring extreme conditions. During the time period that Danbury was experiencing it's most severe internal COVID pandemic, Mr. Clarke was subjected to almost inhumane treatment: locked in a cage for more than 20 hours per day; unable to take daily showers; restricted movement; and most spirit crushing—no personal contact with family or friends.

Indeed, during the Spring of 2020, Mr. Clarke experienced one of the worst COVID 19 outbreaks in the United States. The incidents of positive COVID inmates and guards were among the highest in the Country. The conditions were so bad at Danbury, one of the first civil law suits was filed against the Warden of Danbury.[7] Prior to arriving at Danbury, Mr. Clarke received several visits from his mother, daughter, girlfriend, sister and other members of his family. He also was allowed to make regular calls to his daughter and play as much a role in her life as he could possibly could. Since his time at Danbury, however, he has not been able to see his

---

[6] Contrary to Mr. Clarke's initial filing, I have confirmed that Mr. Clarke has not contracted COVID while housed at Danbury. On the other hand, he has had severe symptoms of COVID which indicates that should he contract COVID with his pre-existing medical conditions, he may get seriously ill or die.

[7] https://law.yale.edu/sites/default/files/area/clinic/document/complaint_and_exhibits_-_filed_copy.pdf

daughter at all. He has not received any visitation. He is allowed approximately 15 minutes per day to make phone calls. Essentially, he has been in isolation for over a year which probably accounts for the surge in his blood pressure and the frequent visits to the medical unit complaining of headaches, dizziness and blurred vision. By all accounts, this is as close to torture or un-American treatment of prisoners as possible.

**Release Plan**

If released to home detention, Mr. Clarke would have a stable home in which to live with his sister, Jiavanni Clarke, his mother, Carret James and his nephew Jaivion Clarke. They would reside in a three (3) bedroom residence and Mr. Clarke would have his own room where he would safely quarantine upon his release. Thereafter, he could practice social distancing and proper hygiene to protect himself from contracting COVID-19, in a manner that is simply impossible at Danbury. Mr. Clarke therefore has a safe release plan if this Court grants the motion.

**3553a Factors**

In evaluating motions for compassionate release, "[t]he Court must also consider the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *8. Among the factors to be considered under § 3553(a) are: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from future crimes of the defendant; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). Here, the 3553(a) factors weigh heavily in favor of a reduction in sentence for Mr. Clarke.

There is no doubt that the crimes committed by Mr. Clarke were serious. But the real question is: whether he will be a danger to the community if he is released back into the community. There simply is no evidence that he will be a danger. As the Government conceded, Mr. Clarke's disciplinary record indicates a positive sign for his future. He has a nine (9) year old daughter that provides motivation for him to remain crime free. He has participated in educational programs and remained free of any violence while incarcerated. While we agree that the crimes of conviction are serious, they were committed when Mr. Clarke was a much younger man and considerably less mature. Conviction of a violent crime in and of itself should not be a barrier to compassionate release.[8] There can be no serious argument that Mr. Clarke has not

---

[8] *See, United States v. Gluzman*, No. 96 Cr. 323 (LJL), ECF Dkt. 117 (S.D.N.Y. July 23, 2020) (granting release to 71-year-old defendant at FMC Carswell originally sentenced to life for conspiracy to commit murder, and actually committing murder of her husband under 18 U.S.C. §§ 371 and 2261(a)(1) where the defendant had numerous debilitating medical conditions rendering her essentially unable to care for herself); and *U.S. v. Diego Rogriguez, supra,* (defendant convicted for killing and torturing a confidential informant. Judge Rakoff resentenced the defendant to 30 years from an original life sentence)

already been seriously punished for his offense, his first offense where he has been required to serve a significant prison sentence.

Additionally, he is serving double time due to the Pandemic conditions. It was clear that this Court wanted to send a message to Mr. Clarke by sentencing him to 90 months of incarceration.  But, as stated above, the Court could not have intended this type of punishment. "While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing. See, e.g., United States v. Rodriguez, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. While a person without any pre-existing health conditions is suffering immensely during this incarceratory period, a person with pre-existing health conditions must be suffering even more. As Judge Engelmayer noted, "a day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison." *See, United States v. Ciprian*, 11 Cr 1032 (PAE), Dkt. 2581, p. 3-4. Thus, even if the Court does not grant Mr. Clarke's release, the Court should reduce Mr. Clarke's sentence to reflect the harsh and unexpected prolonged treatment Mr. Clarke is experiencing as evidenced by his many visits to the medical unit and his increasing blood pressure.

**Conclusion**

For the foregoing reasons, Mr. Clarke respectfully requests that the Court reduce his sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home detention or in the alternative, reduce his sentence to 70 months of incarceration.

Sincerely,

**/s/  *Xavier R. Donaldson***

Xavier R. Donaldson

.